IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2022

**LEON DENTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-02872          James M. Lammey, Judge**

_____

**No. W2021-01289-CCA-R3-PC**

_____

Petitioner, Leon Denton, appeals the post-conviction court's denial of his petition for post-conviction relief.   On appeal, Petitioner raises several claims of ineffective assistance of counsel.  After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Phyllis Aluko, District Public Defender; Madeline K. Hopper, Assistant Public Defender, for the appellant, Leon Denton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Mike Haas, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Petitioner's convictions stem from participating in several crimes against three female victims on October 16, 2011.  *State v. Leon Denton and Devan Denton*, No. W2016-00910-CCA-R3-CD, 2017 WL 3600464, at *1 (Tenn. Crim. App. Aug. 21,

_____

[1] Judge Williams, the Presiding Judge of the Court of Criminal Appeals, died on September 2, 2022.  The members of this panel of the Court acknowledge Judge Williams's steadfast leadership, sharp wit, and overall positive influence on the judiciary during his many years of service to Tennessee.  He will be greatly missed by all of his colleagues.

2017), *perm. app. denied* (Tenn. Dec. 8, 2017). Petitioner and his codefendant-brother, Devan Denton, were tried together.[2] *Id.* The facts at trial established that three women, K.W., L.G., and C.C., met Petitioner's codefendant-uncle, Antonio Howard, and James Kerrigan around 2:00 a.m. outside a nightclub in Memphis.[3] *Id.* After a short conversation, the women arranged to "hang out" with the men at K.W.'s apartment. *Id.* Unbeknownst to the women, Mr. Howard invited Petitioner, Devan Denton, and Brian Norwood to join them. *Id.* The five men and three women drank and smoked marijuana for approximately one hour before a gun fell out of Mr. Howard's pocket and another out of Mr. Kerrigan's pocket. *Id.* at *2. The women became frightened and asked the men to leave the apartment. *Id.*

Petitioner, Devan Denton, Mr. Kerrigan, and Mr. Norwood moved toward the door. *Id.* Mr. Howard asked to use the bathroom. *Id.* He emerged from the bathroom holding his gun and yelled, "This is a robbery." *Id.* He ordered the women to remove their clothes and knocked K.W. unconscious. *Id.* Mr. Howard grabbed L.G. and forced her to perform oral sex on him in front of the other men. *Id.* Mr. Howard then forced L.G. into the bedroom and Petitioner followed. *Id.* L.G. testified at trial:

> [Mr. Howard] led me to the room, and he had the gun. And he told me to get down and give him some head. And then [Mr. Howard] got another guy in there with him to – so he could get some head. [Mr. Howard] got behind me and started having sex with me; and then [Petitioner] got in front, and I had to give him oral sex. And the guy that I had to give oral sex to ejaculated in my mouth, and made me swallow.

*Id.* C.C. testified that Mr. Howard's interaction with Petitioner "wasn't like anything forceful." *Id.* Mr. Kerrigan testified that he saw Mr. Howard "put his arm around [Petitioner] and told [Petitioner] to come to the back with him[.]" *Id.* at *3. Mr. Norwood testified similarly to both C.C. and Mr. Kerrigan. *Id.* Memphis Police Department Lieutenant Celia Tisby read a statement that Devan Denton gave to the police. *Id.* at *4. The statement read, in relevant part:

> [Mr. Howard] told me and everybody else to get the lady's flat-screen TVs, and me and my friend said, "No, we didn't want nothin' because we ain't part of this shit." He told us we were gonna make him shoot one of these bitches if we didn't grab a TV. We still didn't move. We were froze. He said—he said, "I got to get what I came for." He took the female who was

---

[2] For clarity, we will refer to Devan Denton by his full name throughout the opinion.
[3] It is the policy of this Court to protect the identity of victims of sexual abuse by referring to them by their initials.

red, about five/eight, and he took her and strut her around and said—he said, "Do you all like this?" He took her to the couch, and he made her suck him up, and he asked anyone else if they wanted any, and we—no one said anything. And he said, "Okay. More for me."

He finished, and then he had the gun in his hand and grabbed my little brother [Petitioner]. He wrapped his right arm around my brother's neck and had the gun in his left hand and told him to come here so he can holler at him, and they went to the bedroom with the girl who had just sucked him off.

. . .

I walked in, and [Mr. Howard] was raping this lady. It was from the rear. She was on the floor on all fours. I walked in there. I see he still have a gun, but it is in his right hand now. My brother was sitting on her bed, and she was sucking—performing oral sex on my brother. My uncle looked around and said, "Oh, you want some of this too." He jumped up out of her, and he got up out of her, and he told her to go over there and, "Suck my n**** up."

*Id.*

At the conclusion of the trial, Petitioner and Devan Denton were both convicted of three counts of aggravated rape, one count of facilitation of rape, one count of facilitation of especially aggravated robbery, and two counts of facilitation of aggravated robbery. *Id.* at *5. The trial court dismissed Petitioner's facilitation of aggravated robbery convictions at the sentencing hearing, noting that they were incorrectly recorded on the judgment forms. *Id.* The court sentenced both Petitioner and Devan Denton to an effective 15 years' incarceration. *Id.*

Petitioner and Devan Denton filed a joint appeal, arguing that the evidence was insufficient to support their convictions because the State failed to counter the duress defense and that their right to a speedy trial was violated. *Id.* Petitioner independently argued a double jeopardy violation. *Id.* A panel of this Court affirmed the brothers' convictions. *Id.* at *10.

Petitioner filed a timely petition for post-conviction relief alleging a wide array of issues. The post-conviction court appointed counsel. Petitioner filed an amended petition through appointed counsel, incorporating his original claims and alleging additional ineffective assistance of counsel allegations; specifically, that trial counsel (1)

failed to consult with and present testimony from an expert in "sexually offending behavior," (2) failed to protect Petitioner's rights under the confrontation clause regarding Devan Denton's police statement, (3) failed to move for a mistrial after the State's witness revealed to jurors that Petitioner was in jail, and (4) failed to call Antonio Howard after he claimed responsibility for forcing Petitioner's participation in the rapes. The post-conviction court held an evidentiary hearing.

Trial counsel testified that he had practiced law for 15 years and tried over 100 cases at the time of Petitioner's trial. Trial counsel recalled meeting with Petitioner several times. He described Petitioner as very articulate and a good artist. He remembered Petitioner's case contained straightforward facts but a "complicated legal argument to convince a jury of [Petitioner's] innocence." Trial counsel agreed he argued that Petitioner was under duress and "had no choice but to engage in this conduct of aggravated rape[.]" Trial counsel recognized the importance of this defense. During voir dire, trial counsel sought to educate the prospective jury on the behaviors of rape victims and explained that victims of rape could still orgasm.

Trial counsel remembered that the victims' police statements were "really, really kind to [Petitioner] in their description of his behavior." He recalled his strategy was to highlight Petitioner's behavior as compared to Mr. Howard's behavior, who "just went nuts. I mean, just crazy and to separate that out." Trial counsel admitted he did not read studies on "male victims . . . and sexual assault[,]" but stated that he went to an annual training on the topic of sexual assault. Trial counsel testified he was not familiar with "experts in the area of male victim sexual assault." Trial counsel said he did not speak with any experts on male victim sexual assault and did not consider calling such an expert. He agreed he could have requested funding for an expert but was unsure if he "could [have] pass[ed] the threshold of reasonable and necessary."

Trial counsel confirmed that he knew of the letter from Antonio Howard. However, he did not investigate the authenticity of the letter. Trial counsel recalled that Mr. Howard was represented by his counsel. Trial counsel would have had to get Mr. Howard's "attorney to agree to allow him to testify admitting that he did it while [Mr. Howard's] case was still on appeal." Initially, trial counsel remembered that the letter only reaffirmed what the jury already knew, that Mr. Howard was responsible for the rapes. However, after re-reading the letter, he agreed that Mr. Howard took responsibility for forcing Petitioner's participation against Petitioner's will. Trial counsel maintained that he considered introducing the letter as evidence but ultimately chose not to use it.

Trial counsel recalled that Devan Denton made a statement to the police. Trial counsel agreed that Devan Denton's statement identified Petitioner and placed him at the

apartment receiving oral sex from the victim. However, trial counsel stated that those facts were not in dispute. He agreed Petitioner had a right to confront and cross-examine witnesses against him at trial. Trial counsel maintained that Devan Denton's statement helped, rather than hurt, Petitioner.

Trial counsel could not recall when he first advised Petitioner regarding his right to testify but agreed it would have been before trial. Trial counsel stated that generally, he had conversations with clients about whether to testify during the trial as well. Trial counsel stated that the decision to testify was "totally [the client's] decision. It's left up to him." He stated, however, that he was "very clear with [his] clients whether [he] thinks they should testify or not." Trial counsel could not recall his advice to Petitioner.

Trial counsel testified that he had only argued the defense of duress in Petitioner's case but that he had proceeded to trial with the defense of self-defense several times. Trial counsel again confirmed that he did not call an expert on male victim sexual assault. Trial counsel testified that he elicited testimony from the victims to establish Petitioner's duress defense. Trial counsel believed the proof was overwhelming that Petitioner had sexual contact with the victim but that they "made a sufficient showing through the evidence by highlighting that [Mr. Howard]'s behavior, that [Petitioner] was placed under duress."

On cross-examination, trial counsel explained that he did not seek to admit Mr. Howard's letter because Mr. Howard's behavior was so well-established at the trial. He also believed there would be difficulty in authenticating the letter and that the jury might see the letter as Mr. Howard's "trying to cut his nephew loose and lying." Trial counsel testified that he had seen "too many jail house letters blow up in [his] face."

Regarding Devan Denton's statement, trial counsel believed it gave credibility to Petitioner's duress defense because it tended to show Mr. Howard forced the brothers into their situation. Trial counsel testified that he always discussed the risks and benefits of testifying at trial with his clients. The post-conviction court asked trial counsel whether he analyzed the letter from Mr. Howard. Trial counsel replied, "Right." Trial counsel again explained the difficulties of authenticating the letter due to Mr. Howard's representation by counsel and pending appeal.

Petitioner testified trial counsel reviewed limited facts and strategy with him before the trial. Petitioner said trial counsel discussed the theory of duress with him but that he did not want to use it because he "was truly just a victim to the whole situation." Petitioner confirmed that trial counsel discussed his potential testimony at trial and the associated risks. However, Petitioner then claimed, "[t]he thing he told me about the risk of testifying was that trial [j]udge had stated that he was [going to] give me and my

brother life if I was to testify on the stand." Petitioner said that he and trial counsel discussed whether to testify during a recess at trial and trial counsel advised against testifying. Petitioner claimed that he repeatedly expressed his desire to testify but trial counsel told him that Petitioner was not "f***ing [the trial] up for them[.]" Petitioner also claimed that trial counsel said, "okay, you can testify only if you -- if you send my daughter a Christmas card every year and say your father is smarter than me[.]" Petitioner claimed trial counsel told him he would receive either life in prison or 177 years' incarceration if he testified. Petitioner said he felt threatened by trial counsel.

Petitioner believed that his trial testimony would have changed the outcome of the trial because he would have testified that Mr. Howard "had a gun on [the victim] and was ordering her to do things, you know, against her will. And [Petitioner] refused to [sic] everything that was taking place." Petitioner said that the victim was forced to commit a crime under duress against him and that he refused oral sex several times.

On cross-examination, Petitioner stated that he did not have much time to review discovery with trial counsel. Petitioner admitted that during his *Momon* hearing he told the trial court that he did not wish to testify. He explained, however, that he "was pretty much out of [his] mind, out of [his] body." Petitioner said he paused for two to three minutes during the *Momon* hearing and was looking around for "a family member to actually stand up and tell [him], Well, speak up, you know." Petitioner said he did not walk out of the apartment because Mr. Howard had a gun and was directing the victim to do something against her will. He agreed that he did not feel free to leave. The post-conviction court asked Petitioner, "Did I tell you I would give you 177 years?" Petitioner replied that he heard it from trial counsel, not the trial court.

The post-conviction court found that trial counsel had a "good grasp" of the main issue and that duress was the only possible defense. The post-conviction court stated it was unsure what an expert in sexually offending behavior would have testified about regarding Petitioner's behavior. The court found trial counsel to be "very, very credible" and that if he advised Petitioner not to testify, "that the advice that he gave was pretty good." The post-conviction court stated that it believed Petitioner was culpable and that he could have walked out of the room. Regarding the threat of the trial court imposing a 177-year sentence, the post-conviction court stated trial counsel "properly pointed out that Mr. Howard get [sic] 120-something years and that if there is any doubt in the jury's mind that it was duress, [Petitioner], by testifying probably would have erased all doubt and . . . gotten more time. That's all speculation." The post-conviction court stated, "I don't find [Petitioner] too credible at all." The post-conviction court found that Devan Denton's statement "clearly helped [Petitioner.] . . . It went along with the duress." The post-conviction court stated that it did not know how trial counsel could have gotten Mr. Howard's letter into the evidence. The court explained that because Mr. Howard's case

was on appeal at the time, Mr. Howard most likely would not have testified, and the court was unsure how trial counsel could have authenticated the letter. The post-conviction court stated that it did not find deficient performance or prejudice, and denied the petition for post-conviction relief.

Petitioner now appeals.

*Analysis*

Petitioner argues that the post-conviction court erred in denying relief because trial counsel provided ineffective assistance of counsel. Specifically, Petitioner argues that trial counsel was ineffective for: (1) failing to present an expert in the area of male victim sexual assault; (2) failing to protect Petitioner's right to confrontation when Devan Denton gave a police statement that was entered into the evidence; (3) failing to call Antonio Howard as a witness after Mr. Howard allegedly wrote a letter claiming responsibility for forcing Petitioner's participation in the rape; and (4) preventing Petitioner from exercising his right to testify. The State responds that the post-conviction court properly denied relief because Petitioner failed to show deficient performance or prejudice.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In

order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two-prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

In addition, this Court must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369).

Petitioner argues that trial counsel was ineffective for failing to present an expert witness in the area of male victim sexual assault. However, Petitioner did not offer the testimony of such an expert at the evidentiary hearing or explain what the expert might have said on the matter. We cannot speculate "as to what the [expert] evidence would have shown and . . . how it would have benefitted Petitioner." *Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998) (internal citations omitted). When a petitioner alleges trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Without such evidence, post-conviction relief is not warranted. *Id.* The post-conviction court found nothing in the record explaining the testimony of an expert of male victim sexual assault. The evidence does not preponderate against this finding. Petitioner has failed to prove prejudice and is not entitled to relief.

Petitioner claims that trial counsel was ineffective for failing to protect his right to confrontation when the State introduced Devan Denton's police statement. Trial counsel testified that the statement helped establish Petitioner's defense of duress because it tended to show Mr. Howard's control over the situation. The post-conviction court credited trial counsel's testimony. The court found that Devan Denton's statement clearly helped Petitioner, and the evidence does not preponderate against this finding. Petitioner is not entitled to relief.

Petitioner alleges trial counsel was ineffective for failing to call Antonio Howard as a witness after Mr. Howard allegedly wrote a letter claiming responsibility for "forcing Petitioner to participate in the charged crimes[.]" Trial counsel testified that Mr. Howard's direct appeal was pending at the time of Petitioner's trial and that Mr. Howard was represented by counsel. The difficulties of authenticating the letter and calling Mr. Howard as a witness aside, trial counsel testified that the jury already knew Mr. Howard was primarily responsible for the crimes. Trial counsel testified that he had seen too many jail house letters backfire and that the jury might see the letter as Mr. Howard's trying to cut Petitioner loose. Again, the post-conviction court credited trial counsel's testimony and agreed that it was unclear how trial counsel would have authenticated the letter or procured Mr. Howard as a witness. The evidence does not preponderate against these findings. Petitioner has failed to show deficient performance or prejudice and is not entitled to relief.

Lastly, Petitioner argues that trial counsel prevented him from testifying at his trial. Specifically, Petitioner argues that trial counsel threatened Petitioner and told him that the court would sentence him to 177 years if he testified. Trial counsel did not recall his specific discussion with Petitioner but stated that he always left the decision up to the

client.  Petitioner admitted that he told the trial court at his *Momon* hearing that he did not wish to testify.  The post-conviction court stated that if Petitioner testified in a similar manner at trial as he did at the evidentiary hearing, the jury may not have considered his defense of duress at all.  The evidence does not preponderate against this finding. Petitioner is not entitled to relief.

## *Conclusion*

Based on the foregoing, the judgment of the post-conviction court is affirmed.


_____
TIMOTHY L. EASTER, JUDGE